IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 27, 2001 Session

## BARBARA ANN GASKINS v. ROGER ARTHUR GASKINS

Appeal from the Circuit Court for Greene County
No. 99CV069, Ben K. Wexler, Judge

**FILED NOVEMBER 29, 2001**

**No. E2000-02915-COA-R3-CV**

---

This appeal from the Circuit Court of Greene County questions whether the Trial Court erred in awarding Ms. Gaskins alimony for a seven year period. Mr. Gaskins appeals the decision of the Circuit Court of Greene County. We affirm the decision of the Trial Court as modified and remand for further proceedings consistent with this opinion. We adjudge costs of the appeal against the Appellant, Roger Arthur Gaskins, and his surety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed As Modified; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

K. Kidwell King, Jr., Greeneville, Tennessee, for the Appellant, Roger Arthur Gaskins.

David L. Leonard, Greeneville, Tennessee, for the Appellee, Barbara Ann Gaskins.

**OPINION**

This appeal arises from a divorce between Roger Arthur Gaskins, the Appellant, and Barbara Ann Gaskins, the Appellee. Mr. Gaskins appeals the judgment of the Greene County Circuit Court and presents for our review one issue which we restate: whether the Trial Court erred in awarding Ms. Gaskins alimony.

We affirm the judgment of the Trial Court as modified and remand for such further proceedings, if any, as may be necessary.

Mr. and Ms. Gaskins were married on September 24, 1976. Ms. Gaskins filed a complaint for divorce on February 3, 1999. The parties entered into a Marital Dissolution Agreement on July 29, 1999, and were divorced by an Agreed Judgment of Divorce on the same date. The parties were

granted an irreconcilable differences divorce in which they settled all matters of real and personal property, assets and liabilities. However, the parties reserved the question of alimony for the Trial Court.

The alimony hearing was held on February 25, 2000. Following the hearing, the Trial Court asked the parties to submit briefs regarding the question of alimony and health insurance. On April 18, 2000 the Trial Court entered an order requiring Mr. Gaskins to pay to Ms. Gaskins alimony in an amount of $350.00 per week for a period of 104 weeks, $300.00 per week for a period of 104 weeks, and $250.00 per week for a period of 156 weeks. Additionally, the Court ordered Mr. Gaskins to provide medical insurance to Ms. Gaskins for a period of 5 years or until she becomes employed and is offered medical insurance through her employer.

We review the Trial Court's findings of fact *de novo* upon the record of the proceedings below, with a presumption of correctness "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see also Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). There is no presumption of correctness with regard to the trial court's conclusions of law, and those conclusions are reviewed *de novo*. *Jahn v. Jahn*, 932 S.W.2d 939 (Tenn. Ct. App. 1996).

Mr. Gaskins appeals the Trial Court's award of alimony to Ms. Gaskins. In the April 18, 2000 opinion, the Trial Court stated the following:

> In Tennessee it appears that the court in determining whether to grant alimony should consider the following, (1) earning capacity, (2) obligations, (3) needs, (4) financial resources of the parties, (5) education and training of the respective parties, (6) ability to secure educational training, (7) duration of the marriage, (8) provision regarding the marital property, (9) standard of living during the marriage, (10) fault of the parties.
>
> As to number ten above, it appeared, very convincing, that the husband had a year long sexual affair with one of his customers, which was the main reason for the divorce. The parties had an above average standard of living during the marriage, and the wife's only income now, unless she obtains employment, is $750.00 per month from the interest on the note signed by her husband. When the marital property was divided between the parties the husband got the large home and the debt on same, plus the marital business, which had gross income of about $1,000,000.00 a year, and is the only income producing property involved in this case. The parties had about equal educational training, and at the wife's age, it would be very difficult for her to go back to school and obtain additional training. Court feels that it would be unproductive for her to try to obtain additional education. The best financial resource is the family business and the husband has this business. Both of these people

have needs, but with the husband owning and operating the family business, and she has no job, at this time, he has a much better opportunity to satisfy his needs. The same would be true about their obligation. The wife has some earning capacities, but she does not have employment now.

After considering all the guidelines whether to grant alimony or not to grant alimony, the court feels and is of the opinion that the husband operating the family business has a much better chance of meeting his obligations and making a satisfactory living than the wife does at this time. The court grants alimony to the wife of $350.00 per week for 104 weeks, $300.00 per week for 104 weeks, $250.00 per week for 156 weeks. Also the husband is to pay the wife's medical insurance for 5 years, unless she obtains employment in some business that offers medical insurance, in that event she is to contract and pay for her own medical insurance.

The Trial Court has broad discretion in determining an award of alimony. *Loyd v. Loyd*, 860 S.W.2d 409 (Tenn. Ct. App. 1993). The decision is factually driven and requires a balancing of the factors listed in T.C.A. 36-5-101(d). *Loyd v. Loyd*, 860 S.W.2d 409 (Tenn. Ct. App. 1993). Of these factors, need and the ability to pay are the most critical. *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984). Accordingly, this Court is not inclined to alter a trial court's award of alimony unless it is unsupported by the evidence or is contrary to the public policy embodied in the applicable statutes. *Brown v. Brown*, 913 S.W.2d 163 (Tenn.Ct.App.1994).

The following factors, codified at T.C.A. 36-5-101(d)(1) are to be considered in determining an award of alimony:

> (d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term,

and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Mr. Gaskins argues that the Trial Court did not weigh all of the factors listed in T.C.A. 36-5-101(d)(1), but that it focused solely on the duration of the marriage and fault of Mr. Gaskins. He further argues that the Trial Court acknowledged the fact that the parties have "about equal education and training," but failed to place the appropriate emphasis on that factor when making the alimony determination. Additionally, Mr. Gaskins argues that Ms. Gaskins's financial needs are exaggerated by the fact that while she is fully capable of employment, she refuses to enter the work force and that Mr. Gaskins's inability to pay was ignored by the Trial Court. Finally, Mr. Gaskins argues that the Trial Court ignored the analysis of David Ellis, an accountant who testified at a hearing on October 16, 2000, as to the financial status of Mr. Gaskins's closely held corporation, Modern Slaughters, Inc., d.b.a. Modern Meats and Seafood (hereinafter referred to as MMS).

Ms. Gaskins argues that the most important factor in awarding alimony is the need of the party seeking support and that the amount of alimony to be awarded should be determined such that spouses are not left in a worse financial situation than they would have been but for the other party's misconduct. She asserts that Mr. Gaskins acknowledged her need for support by agreeing, in the property settlement, to allow her to continue her employment at MMS in lieu of temporary alimony pending the resolution of this matter.[1]

Ms. Gaskins focuses on eight of the statutory factors in arguing that the Trial Court did not err in its decision. The first factor Ms. Gaskins argues is T.C.A. 36-5-101(d)(1)(A), and she asserts that Mr. Gaskins now has sole ownership of a valuable, income producing property and she is unemployed and has been unable to find suitable employment. Ms. Gaskins makes the same argument with respect to T.C.A. 36-5-101(d)(1)(B), and adds that rehabilitation with regard to securing any secondary education is not feasible.

Next, Ms. Gaskins argues T.C.A. 36-5-101(d)(1)(C), maintaining that the marriage lasted almost 23 years and that she and Mr. Gaskins built MMS together creating a standard of living they both enjoyed. Ms. Gaskins argues T.C.A. 36-5-101(d)(1)(G), stating that her only source of income is a payment of $750.00[2] each month by Mr. Gaskins, which is the interest on a $120,000.00 note Mr. Gaskins is responsible for as part of the marital dissolution agreement. Additionally, she asserts once again that Mr. Gaskins has the benefit of his closely held corporation and she is unemployed. She also contends that she has only a $170,000.00 home while Mr. Gaskins is living in a $305,000.00 home.

The next provision Ms. Gaskins argues is T.C.A. 36-5-101(d)(1)(H), asserting that the marital dissolution agreement was unfair and that Mr. Gaskins received a larger share of the marital estate. In setting forth T.C.A. 36-5-101(d)(1)(I), Ms. Gaskins asserts that she and Mr. Gaskins enjoyed a high standard of living during the marriage and that she is currently unable to maintain a decent standard of living. Furthermore, she contends that she should not be forced to exhaust her retirement in order to have an appropriate standard of living while Mr. Gaskins lives in an 8,000 square foot house valued at over $300,000.00.

The next factor Ms. Gaskins addresses is T.C.A. 36-5-101(d)(1)(J), maintaining that during her marriage to Mr. Gaskins she helped raise his two children from a previous marriage, in addition

---

[1]Mr. and Ms. Gaskins were the sole stockholders of their closely held corporation, Modern Slaughters, Inc., d.b.a. Modern Meats and Seafood, prior to the divorce. In the marital dissolution agreement, Mr. Gaskins became the exclusive shareholder and Ms. Gaskins received a monetary settlement for her interest in the corporation. Following the divorce, Ms. Gaskins continued her employment at Modern Meats and Seafood as the bookkeeper as she had been for many years. The marital dissolution agreement allowed her to continue in that position until the alimony trial.

[2] According to the Marital Dissolution Agreement, Mr. Gaskins shall pay to Ms. Gaskins the sum of $120,000.00 at 7.5% interest per year. Mr. Gaskins will make interest payments of $750.00 per month for the next seven years with the balance being due at the end of the seven year period. Mr. Gaskins may make payments toward the principal if he chooses, without penalty, or he may pay the entire balance prior to the end of the seven year period without penalty.

to raising their two children. She also asserts that she helped care for Mr. Gaskins's mother until she was placed in a nursing home. Additionally, she contributed to building MMS. Finally, Ms. Gaskins argues that Mr. Gaskins's year-long affair caused the dissolution of the marriage.

The purpose of spousal support is to assist the disadvantaged spouse in becoming self-sufficient and when economic rehabilitation is not feasible, to mitigate the harsh economic reality of divorce. *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn.Ct.App.1998). Divorced couples often lack sufficient income or assets to enable both parties to maintain their pre-divorce standard of living; however, the obligor spouse may be able to provide some financial assistance to enable the disadvantaged spouse to approach his or her former financial condition. *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn.Ct.App.1998). Need and ability to pay are the critical factors in setting the amount of alimony award. *Smith v. Smith*, 912 S.W.2d 155 (Tenn. Ct. App. 1995); *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984). In *Lancaster*, this Court stated:

> Alimony is not and never has been intended by our legislature to be punitive. *See McClung v. McClung*, 29 Tenn. App. 580, 198 S.W.2d 820, 822 (1947). Nor do we believe it was intended simply as an award for virtue. It is not designed to serve as an annuity for the wife; or as Professor Clark has stated "[t]he purpose of alimony is to care for the wife's needs after divorce, not to provide her with a life-time profit-sharing plan." H. Clark, *Law of Domestic Relations* § 14.9(4) (1968).

*Lancaster v. Lancaster*, 671 S.W.2d 501, 503 (Tenn. Ct. App. 1984).

We must first determine whether Ms. Gaskins is economically disadvantaged as compared to Mr. Gaskins and if so, whether she can be rehabilitated successfully. T.C.A. 36-5-101(d)(1). Based on the record before this Court, we find that Ms. Gaskins is economically disadvantaged as compared to Mr. Gaskins. Mr. Gaskins has a stronger earning capacity than Ms. Gaskins as he continues to own and operate his closely held corporation which generates a salary for him of approximately $25,000.00 per year. Mr. Gaskins remains in control of his corporation where he and Ms. Gaskins spent a tremendous amount of time and energy building a company that has been a successful livelihood for many years. He also has the ability to maintain his health insurance policy through MMS and derives many benefits from owning a closely held corporation.

In assessing the parties situation with respect to the factors set forth in T.C.A. 36-5-101(d)(1), the record reflects that upon entry of the final judgment for divorce, Mr. and Ms. Gaskins had an equal amount of money invested in Individual Retirement Accounts. The parties have similar levels of education and training. Both participated in building and maintaining MMS. Ms. Gaskins has at least twenty years experience as a bookkeeper for MMS. She testified at trial that her role at MMS included duties other than bookkeeping. Ms. Gaskins further testified that her job responsibilities also included paying taxes, making sales calls, maintaining the telephone, all computer work, operating the fax machine and copy machine, cleaning the office, cooking meals,

taking messages, customer service and anything else that needed to be done. She testified that she worked as hard as Mr. Gaskins every day and that his work was "physical" and her contribution was more "mental." Ms. Gaskins also stated at trial that she often worked more than forty hours a week.

This was unquestionably a marriage of significant duration. Both parties have testified to being in good mental and physical health. Mr. Gaskins did suffer a heart attack a few years ago, but continues to operate MMS. As for the provisions made with respect to the marital property, the parties signed a Marital Dissolution Agreement prior to the hearing on alimony. Ms. Gaskins is not appealing any issues regarding the property settlement in the Marital Dissolution Agreement, but argues that it was unfair for various reasons even though she did sign the Agreement.

Mr. and Ms. Gaskins enjoyed a comfortable standard of living during their marriage, but it is important to note that both parties were paid a salary from MMS. Ms. Gaskins contributed to that standard of living as both a homemaker and wage earner. Following the alimony hearing on this matter, Ms. Gaskins became unemployed.[3] While Ms. Gaskins does acknowledge at least twenty years experience as a bookkeeper for MMS, she also worked very hard at building this business and upon leaving her position as bookkeeper, she was subject to losing her income as well as her health insurance coverage. Finally, Mr. Gaskins has admitted to an affair during the last year of his marriage to Ms. Gaskins.

In Tennessee there is a preference for rehabilitative alimony. However, where rehabilitation is not feasible, a court may grant alimony in solido or periodic alimony. T.C.A. 36-5-101(d)(1) This Court must determine whether or not Ms. Gaskins can be rehabilitated. Ms. Gaskins is currently 53 years of age and lacks a post-secondary degree. It is not practical that Ms. Gaskins should begin an educational program at a college or trade school at this point in her life. While many individuals choose to return to college later in life, we certainly do not want to require that of Ms. Gaskins. Even if Ms. Gaskins were to return to college and obtain a degree, it would be difficult for her to ever achieve a level of financial security equal to that of Mr. Gaskins or for her to obtain a similar standard of living when viewed in the context of her pre-divorce economic condition. We believe that rehabilitation for Ms. Gaskins at this time in her life is not feasible and because of her work experience and work history, we find that rehabilitation is not necessary.

Ms. Gaskins has valuable computer skills. She assisted her husband in starting, operating and maintaining a successful business. Her resume is complete with at least 34 years of work experience and at times she even maintained two jobs in order to provide for her family. Ms. Gaskins testified in her deposition on September 9, 1999, that she was in good mental and physical health. Ms. Gaskins testified that but for this divorce, she would still be working at least forty hours a week as a bookkeeper for MMS. This Court can find no reason why Ms. Gaskins cannot now re-enter the work force.

---

[3] Following the entry of the divorce decree, Ms. Gaskins continued to work at MMS earning a salary of $475.00 per week. The Marital Dissolution Agreement gave Ms. Gaskins the right to continue her employment at MMS until the final hearing on alimony.

Ms. Gaskins has listed her monthly expenses as the following:

| | |
|---|---|
| House payment, utilities, upkeep | $ 1,366.00 |
| Transportation | 150.00 |
| Food | 200.00 |
| Laundry | 30.00 |
| Health and dental insurance | 268.00 |
| Miscellaneous | 100.00 |
| Total | $ 2,114.00 |

The only income Ms. Gaskins lists is her $750.00 a month payment from Mr. Gaskins. This leaves her with a need of $1364.00 per month. The Trial Court awarded Ms. Gaskins an amount of $350.00 per week for a period of 104 weeks, $300.00 per week for a period of 104 weeks, and $250.00 per week for a period of 156 weeks. Additionally, the Court ordered Mr. Gaskins to provide medical insurance to Ms. Gaskins for a period of 5 years or until she becomes employed and medical insurance is offered through her employer. The alimony alone for the first two years exceeds the amount Ms. Gaskins needs before health insurance is subtracted. It also fails to take into consideration the ability of Ms. Gaskins to earn an income. Assuming Ms. Gaskins is able to obtain a job for minimum wage, she should be able to contribute at least $800.00 per month to her financial situation. Because Mr. Gaskins is currently providing Ms. Gaskins with health insurance, another $268.00 can be subtracted from her overall need. That leaves a deficit of only $296.00 per month. We therefore find that the Trial Court erred in awarding Ms. Gaskins the aforementioned alimony as the evidence set forth in the record preponderates against a finding that Ms. Gaskins needs such an amount.

One's ability to pay spousal support is also a critical factor in determining an award of alimony. *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984). Ms. Gaskins has been unable to show Mr. Gaskins' ability to pay the amount of alimony the Trial Court ordered. Additionally, Mr. Gaskins has argued that he lacks the ability to pay alimony. In a deposition taken September 9, 1999, Ms. Gaskin testified to the following:

> Mr. King: As the bookkeeper, you know the business is not making money. Correct?
>
> Ms. Gaskins: No. It's not making money.

Ms. Gaskins later testified in more than one hearing that Mr. Gaskins was able to pay her an amount of alimony equal to the salary she was receiving from MMS.

In determining whether Mr. Gaskins has an ability to pay alimony to Ms. Gaskins, we review his affidavit of income and expenses. Mr. Gaskins listed his monthly income and expenses as follows:

Income:

| | |
|---|---|
| Salary from MMS | $1528.00 |
| MMS payment on note | 1800.00 |
| Rental income | 450.00 |
| Rent from Jerry, Darrell, and Tracey | 137.50 |
| | |
| Total income | $3915.00 |

Expenses:

| | |
|---|---|
| Mortgage, taxes, insurance | $2180.00 |
| Utilities | 310.00 |
| Groceries | 600.00 |
| Clothing | 40.00 |
| Medical and prescriptions | 37.00 |
| Greene Co. Bank (loan to pay settlement) | 338.00 |
| Note (Ms. Gaskins) | 750.00 |
| | |
| Total | $4255.00 |

In subtracting Mr. Gaskins's expenses from his income, there is a $340.00 deficit. However, we believe some of Mr. Gaskins expenses are exaggerated. For example, Mr. Gaskins lists groceries as $600.00 per month yet he owns a grocery business[4]. Furthermore, while he may be providing food for himself as well as his three adult children, we still find this to be excessive. We also consider $310.00 per month for electricity and water to be excessive. Mr. Gaskins's home does exceed 8,000 square feet and there are four adults plus one tenant living there. It is understandable that groceries and utilities are expensive. Mr. Gaskins lists the rent paid by his three adult children as $137.50 per month. It obviously costs much more than this to provide for these three adults. However, we are more interested in Mr. Gaskins contributing to the support of Ms. Gaskins than his continued support of three other adults.

In assessing the ability of Mr. Gaskins to obtain financial resources from MMS to pay Ms. Gaskins's alimony, we have reviewed the financial statements of MMS as well as the testimony of Mr. Ellis. Mr. Ellis, a certified public accountant, testified at a hearing on October 16, 2000, that the "company has not shown any progress in profitability or sales in the three year period I looked at." He also testified that sales have dropped off and the number of customers have been decreasing. Mr. Ellis testified that the amount of money it takes to operate the business each year has been steady, and that the corporation sustained losses in 1998 and 2000 while only having a net income

---

[4] Modern Slaughters, Inc., d.b.a. Modern Meats and Seafood, was originally a slaughter house. However, in 1985, it became a wholesale distributor of food products.

in 1999 of $7,074.00.[5] As reflected in the financial statements prepared by Mr. Ellis, MMS incurred a net loss of $8,900.00 and $16,236 during the years ended March 31, 1998 and March 31, 2000 respectively. While the corporation did have sales near $1,000,000.00 in 1998, 1999, and 2000, Ms. Gaskins fails to note that the cost of those goods sold each year ranged from $741,261.00 to $859,697.00. It is evident from the financial statement prepared by Mr. Ellis as well as his testimony that there is little money available for Mr. Gaskins to pay alimony.

Based upon the need demonstrated by Ms. Gaskins and the ability of Mr. Gaskins to pay, we modify Ms. Gaskins alimony payment to $750.00 per month for a period of seven years effective on the date of the Trial Court's primary award and leave the Trial Court's ruling with respect to health insurance intact.

For the foregoing reasons the judgment of the Trial Court is affirmed as modified. This cause is remanded for proceedings not inconsistent with this opinion. Costs of appeal are adjudged against the Appellant, Roger Arthur Gaskins, and his surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE

---

[5] The financial statement prepared by Mr. Ellis used the years ended March 31, 1998, 1999, 2000.